1  Lara Hruska, OSB No. 230637
   lara@cedarlawpllc.com
2  Anna Moritz, OSB No. 225306
   anna@cedarlawpllc.com
3  Cedar Law PLLC
   113 Cherry St., PMB 96563,
4  Seattle, WA 98104-2205
   (206) 607-8277 [tel]
5  Attorneys for Plaintiffs

6

7

8

9              UNITED STATES DISTRICT COURT

10                 DISTRICT OF OREGON

11                  EUGENE DIVISION

12

13  A.M-G., who sues through her parent,      Case No.: 6:24-cv-01517-MC
    P.G.,

14                      Plaintiffs,

15  v.                                        MOTION AND MEMO IN SUPPORT OF
                                              TRO AND PRELIMINARY INJUNCTION
16                                            Individuals with Disabilities Education Act
                                              (IDEA)
17                                            Request for Oral Argument
                                              Expedited Hearing Requested
18  SALEM KEIZER PUBLIC SCHOOLS and
    WILLAMETTE EDUCATIONAL SERVICE
19  DISTRICT,

20                      Defendants.

21  _____

22

23

24  MOTION AND MEMO IN SUPPORT OF TRO             Cedar Law PLLC
    AND PRELIMINARY INJUNCTION              113 Cherry St., PMB 96563
                                              Seattle, WA 98104-2205
                                             lara@cedarlawpllc.com
                                       Ph : (206) 607-8277 | Fax 206.237.9101

## TABLE OF CONTENTS

INTRODUCTION……………….…..………………………………...………..…….....…...… 1

STATEMENT OF FACTS……………...…..………………………..…….…..……….…... 2

PROCEDURAL HISTORY…………………………………………...…..…………….…...6

ARGUMENT…………………………………………………………..…….…..……….. 8

    A. The ALJ Erred in Declining to Reinstate the Student's Stay Put
       Placement in the D/HH Center Site Program …………………………………….......8

        1. The Stay Put Provision Acts as an Automatic Injunction ……………………..…….9

            (a) A Proceeding was Pending when the Parent Invoked Stay Put…………..…10

            (b) The Defendants are Attempting to Alter the Student's Then-
                 Current Placement……………………………………………………11

    B. The ALJ Erred in Granting the Defendant's Motion to Dismiss …………………..…. 15

    C. Injunctive Relief Under Title II of the ADA and Section 504 of the
       Rehabilitation Act ……………………………………………………………… 17

        1. The Student Will Be Denied Meaningful Communication Access
           Through Removal from the D/HH Center Site Program……………………………18

        2. Plaintiff Meets the Traditional Standard for a Preliminary Injunction
           Under Title II of the ADA and Section 504 of the Rehabilitation Act………………19

    D. The Plaintiffs Have Satisfied Federal Rule 65…………………………………….….. 22

CONCLUSION…………………………………………………….……………… 23

Cedar Law PLLC
113 Cherry St., PMB 96563
Seattle, WA 98104-2205
lara@cedarlawpllc.com
Ph : (206) 607-8277 | Fax 206.237.9101

## TABLE OF CASES

*K.D. ex rel. C.L. v. Haw. Dep't of Educ.*, 665 F.3d 1110, 1120 (9th Cir. 2011)…………………8

*Honig v. Doe*, 484 U.S. 305, 108 S.Ct. 592, 98 L.Ed.2d 686 (U.S. 1988)………………………..9

*Sch. Comm. of the Town of Burlington, Mass. v. Dep't of Educ. of Mass.,*
471 U.S. 359, 373, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985)………………………………...…..9

*S.C . ex rel. K.G. v. Lincoln Cnty. Sch. Dist.*, 16 F.4th 587, 589 (9th Cir. 2021)…………………9

*Joshua A. v. Rocklin Unified Sch. Dist.*, 559 F.3d 1036, 1037 (9th Cir. 2009)…………...9, 10, 11

*Olu-Cole v. E.L. Haynes Pub. Charter Sch.*, 930 F.3d 519, 527 (D.C. Cir. 2019)…………....9, 10

*A.D. ex rel. L.D. v. Hawaii Dep't of Educ.*, 727 F.3d 911, 914 (9th Cir. 2013)…………………10

*D.G. ex rel. P.G. v. San Diego Unified Sch. Dist.*, 132 F. Supp. 3d 1224, 1227
(S.D. Cal. 2015)……………………………………………………………………………………10

*N.E. by & through C.E. & P.E. v. Seattle Sch. Dist.*, 842 F.3d 1093, 1098 (9th Cir.
2016)………………………………………………………………………………..…....10, 11, 12

*N.D. v. Reykdal*, 102 F.4th 982, 995 (9th Cir. 2024)………………………………..………….11, 16

*N.D. ex rel. parents acting as guardians ad litem v. Hawaii Dep't of Educ.*,
600 F.3d 1104, 1116 (9th Cir. 2010)……………………………………..………………12, 16

*Flour Bluff Indep. Sch. Dist. v. Katherine M. by Lesa T.,* 91 F.3d 689 (5th Cir. 1996)…………13

*Poolaw v. Bishop*, 67 F.3d 830 (9th Cir. 1995)…………………………………………………13

*Drinker by Drinker v. Colonial Sch. Dist.*, 78 F.3d 859, 867 (3d Cir. 1996)……………………14

*Thomas v. Cincinnati Bd. of Educ.,* 918 F.2d 618, 625–26 (6th Cir.1990)………………...14

*Hale ex rel. Hale v. Poplar Bluffs R-I Sch. Dist.*, 280 F.3d 831, 833–34 (8th Cir. 2002)……….14

MOTION AND MEMO IN SUPPORT OF TRO
AND PRELIMINARY INJUNCTION

PAGE  ii

Cedar Law PLLC
113 Cherry St., PMB 96563
Seattle, WA 98104-2205
lara@cedarlawpllc.com
Ph : (206) 607-8277 | Fax 206.237.9101

*E. E. by & through Hutchison-Escobedo v. Norris Sch. Dist.*, 4 F.4th 866, 873
(9th Cir. 2021)……………………………………………………..……………….14

*Principal Life Ins. Co. v. Robinson*, 394 F.3d 665, 670 (9th Cir. 2005)…………………………15

*U.S. West Commc'n v. MFS Intelenet, Inc.*, 193 F.3d 1112, 1118 (9th Cir. 1999)………………15

*McIntire v. Forbes*, 322 Ore. 426, 434 (1996)……………………………………………………...15

*Chavez v. New Mexico Pub. Educ. Dep't,* 621F.3d 1275 (10th Cir. 2010)…………..…………..16

*Cosgrove v. Board of Educ. of Niskayuna Cent. Sch. Dist.*, 175 F.
Supp. 2d 375, 392 (N.D.N.Y. 2001)…………………………………………………………...17

*Kantak v. Bd. of Educ., Liverpool Cent. Sch. Dist.*, No. 90-CV-4, 1990 WL 36803,
at *2 (N.D.N.Y. Mar. 30, 1990)……………………………………………………….…………17

*Bookout v. Bellflower Unified School District*, 2014 WL 1152948 (C.D. Cal. 2014)…………...17

*K.M. ex rel. Bright v. Tustin Unified Sch. Dist.*, 725 F.3d 1088 (9th Cir. 2013)…....…...18, 20, 22

*Stormans, Inc. v. Selecky*, 586 F.3d 1109 (9th Cir. 2009)……………………………………….20

*Mark H. v. Hamamoto*, 620 F.3d 1090, 1097 (9th Cir.2010)………………………..……20, 21

*Alexander v. Choate*, 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985)……………………20

*Vinson v. Thomas,* 288 F.3d 1145, 1154 (9th Cir.2002)……………………………………….21

*U.S. Airways, Inc. v. Barnett,* 535 U.S. 391, 402, 122 S.Ct. 1516, 152 L.Ed.2d 589 (2002)……21

*Duvall v. County of Kitsap*, 260 F.3d 1124, 1136–38 (9th Cir.2001)……………………….…...21

MOTION AND MEMO IN SUPPORT OF TRO
AND PRELIMINARY INJUNCTION

PAGE  iii

Cedar Law PLLC
113 Cherry St., PMB 96563
Seattle, WA 98104-2205
lara@cedarlawpllc.com
Ph : (206) 607-8277 | Fax 206.237.9101

## STATUTES AND OTHER AUTHORITIES

20 U.S.C. § 1414………………………………………………………………..….1, 4, 5

20 U.S.C. § 1415…………………………………………………..……6, 8, 9, 10, 11

42 U.S.C. § 12132…………………………………………………..………..……17, 18

42 U.S.C. § 12134……………………………………………………...………………17, 18

42 U.S.C. § 12101…………………………………………………………..…………….20

29 U.S.C. §794……………………………………………………………..…………….18

34 C.F.R. § 300……………………………………………….……...……..6, 8, 13

28 C.F.R. § 35……………………………………………………...…………...18

*Letter to Fisher*, 21 IDELR 992 (OSEP 1994)…………………………….…….....…..12

Oregon Rev. Stat. § 343……………………………………………….…..…...6, 8

Oregon Admin. Rules 581-015-2360……………………………………….…..6, 8

Oregon Admin. Rules 581-015-2035………………………………………...…..19

MOTION AND MEMO IN SUPPORT OF TRO
AND PRELIMINARY INJUNCTION

PAGE  iv

Cedar Law PLLC
113 Cherry St., PMB 96563
Seattle, WA 98104-2205
lara@cedarlawpllc.com
Ph : (206) 607-8277 | Fax 206.237.9101

Plaintiffs, A.M-G. and P.G., respectfully move this Honorable Court pursuant to Rule 65 of the Federal Rules of Civil Procedure for an Order preliminarily enjoining Defendants Salem Keizer Public Schools ("SKPS") and Willamette Educational Service District ("WESD") from closing their joint Deaf and Hard of Hearing Center Site Program for middle and high school and reinstating the Student in the program pending the resolution of the Plaintiffs' claims under the Individuals with Disabilities Education Act ("IDEA"), Section 504 of the Rehabilitation Act of 1973 and the Americans with Disabilities Act.

In support thereof, Plaintiffs present the following Memorandum in Support of Motion for Temporary Restraining Order and Preliminary Injunction.

## I.    INTRODUCTION

Plaintiffs A.M-G. and P.G. seek a temporary restraining order and preliminary injunction to reinstate A.M-G. in the Deaf and Hard of Hearing ("D/HH") Center Site Program, which was physically located at Crossler Middle School and Sprague High School, respectively.

A.M-G. ("Student") is a Deaf[1] student with disabilities who receives services through an individualized education program ("IEP") under 20 U.S.C. § 1414 and its implementing regulations. She received her special education and related services through the D/HH Center Site Program until it was unilaterally closed by the Defendants at the end of the 2023-24 school year. This was her "placement" under the IDEA. As such, SKPS was required to provide the Plaintiffs as equal members of the IEP team an opportunity to be meaningfully involved in any decision to change A.M-G.'s placement. Nonetheless, without prior involvement of the

---

[1] "Deaf" is capitalized to indicate both A.M-G.'s hearing status along with her identification as part of a cultural minority group.

MOTION AND MEMO IN SUPPORT OF TRO
AND PRELIMINARY INJUNCTION

PAGE 1 OF 23

Cedar Law PLLC
113 Cherry St., PMB 96563
Seattle, WA 98104-2205
lara@cedarlawpllc.com
Ph : (206) 607-8277 | Fax 206.237.9101

Plaintiffs, on March 21, 2024, the Defendants made the unilateral decision to close the D/HH Program, effective at the start of the 2024/25 academic year. This action harms not only A.M-G. but also all Deaf middle- and high-school students who received services through the D/HH Center Site Program.

A.M-G. filed a due process hearing request in objection to SKPS's failure to provide the Plaintiffs, as members of the IEP team, with an opportunity to meaningfully engage in the placement decision process. SKPS moved to dismiss for lack of ripeness. Plaintiffs moved to enforce A.M-G.'s stay-put rights under the IDEA. The Administrative Law Judge granted Defendants' motion to dismiss and denied Plaintiffs' motion for stay-put. Plaintiffs have filed a petition for review with this court. Plaintiffs' Complaint includes claims for disability discrimination pursuant to § 504 of the Rehabilitation Act and the Americans with Disabilities Act ("ADA").

Plaintiffs are also seeking a temporary restraining order and preliminary injunction enjoining the Defendants from closing the D/HH Program during the pendency of these proceedings because A.M-G. will suffer immediate and irreparable harm by the closure of the D/HH Program for which there is no adequate remedy at law; the Plaintiffs are likely to succeed on the merits of their claims;  the balance of equities is in Plaintiffs' favor, and a preliminary injunction is in the public interest.

## II.    STATEMENT OF FACTS

As described in the Complaint and herein, A.M-G. is a Deaf student who is entering ninth grade for the 2024-25 academic year. Declaration of Paola Gonzalez ("P.G. Decl.") ¶2. She has dual cochlear implants and requires hearing aids to hear environmental sounds, but she communicates almost exclusively though American Sign Language ("ASL"). P.G. Decl. ¶3. As

MOTION AND MEMO IN SUPPORT OF TRO
AND PRELIMINARY INJUNCTION

Cedar Law PLLC
113 Cherry St., PMB 96563
Seattle, WA 98104-2205
lara@cedarlawpllc.com
Ph : (206) 607-8277 | Fax 206.237.9101

such, A.M-G. qualifies as an individual with disabilities under the IDEA, § 504 and the ADA. Since preschool, A.M-G. received special education and related services through the WESD/SKPS D/HH Center Site Program. P.G. Decl. ¶2.

The services that the D/HH Center Site Program provided – and that A.M-G. required to access a free and appropriate public education – included daily access to a Teacher of the Deaf ("TOD"); direct instruction in ASL, onsite full-time certified technology support for her devices; full-time ASL interpreters; transcription services; audiologist support; and access to a cohort of other Deaf students. P.G. Decl. ¶3, 5, 17, 21, 22, 30. Daily access to a TOD is essential for A.M-G.'s success. P.G. Decl. ¶4, 20, 26. The TOD can deliver the same information A.M-G. receives in her general education classroom directly in a culturally competent manner. The Student heavily utilizes her TOD for delivery of specially designed instruction ("SDI") as well as support for all her general education classes.

Access to a cohort of deaf peers who also use ASL is a particularly important component of the D/HH Center Site Program. P.G. Decl.¶5, 7, 18, 22, 24, 25, 26. Because it provided centralized services for deaf students, the D/HH Program was a magnet for students throughout the WESD, not just the Salem-Keizer school district. P.G. Decl. ¶7, 22. These Deaf peers support each other in class directly, thereby improving access to instruction. P.G. Decl. ¶5, 20, 22, 26. Beyond academics, the ability to have peers with similar disabilities and modes of communication is critical to the mental health status of deaf students. P.G. Decl. ¶22, 25, 31. Communicating with both normal hearing students and deaf peers provides an essential mix of levels of communication to allow deaf students to develop language skills. P.G. Decl. ¶24.

MOTION AND MEMO IN SUPPORT OF TRO
AND PRELIMINARY INJUNCTION

PAGE 3 OF 23

Additionally, A.M-G. will not be able to access her education solely through an interpreter. P.G. Decl. ¶19, 20. Interpreters cannot adequately capture and provide a student the same level of access that a communication rich environment does. P.G. Decl. ¶20.

While enrolled at the D/HH Center Site, A.M-G. also relied on daily access to her TOD for assistance with assignments and supplemental instruction from her general education classes. P.G. Decl. ¶4, 20, 26. Her TOD had the necessary linguistic skills and cultural competence to explain concepts and instructions in a manner that A.M-G. was able to better comprehend in her first language, ASL. P.G. Decl. ¶4, 20, 26.

The D/HH Center Site Program was A.M-G.'s "placement" pursuant to 20 U.S.C. § 1414(e). This is supported by the fact that A.M-G.'s Determination of Placement as of May 2022 indicated "Crossler Center Site for D/HH Students" in the description of the placement. See Declaration of Anna Moritz ("Moritz Decl."), Exhibit ("Ex.") A. Although nothing changed the following year, the D/HH Center Site was not specifically named in the Placement Determination dated May 2023. By May 2024, the D/HH Center Site program had been slated for closure. P.G. Decl. ¶10, 11, 12, 13.

It is also clear from the contract between WESD and SKPS regarding the Center Site Program that the Defendants consider the D/HH Center Sites a "placement" pursuant to the IDEA. For instance, that contract states, "SKPS students attend the Regional D/HH Center Site program "as a placement option following SKSD internal procedures." Moritz Decl., Ex. B.

On March 21, 2024, the WESD issued a letter ("closure letter") to A.M-G and P.G. stating that the D/HH Center Site Program would be closed beginning in the 2024/25 school year. P.G. Decl. ¶13; Moritz Decl., Ex. C. The March 21, 2024, letter announcing the closure was issued by Dana Pedersen, Special Education Coordinator with WESD, yet SKPS

Cedar Law PLLC
113 Cherry St., PMB 96563
Seattle, WA 98104-2205
lara@cedarlawpllc.com
Ph : (206) 607-8277 | Fax 206.237.9101

1    Superintendent Castaneda later indicated that the closure was a "joint decision" between SKPS

2    and WESD. Moritz Decl., Ex. D.

3        Although closure of the D/HH Program constituted a change in placement, at no point

4    were the Plaintiffs nor the IEP team provided an opportunity to be a part of the decision to change

5    placement, in violation of 20 U.S.C. § 1414(e). P.G. Decl. ¶14. A.M-G.'s placement was changed

6    through the closure letter to her neighborhood school although the Oregon School for the Deaf

7    was not considered by the Defendants as a potentially less restrictive placement considering her

8    communication needs. P.G. Decl. ¶14.

9        Because A.M-G. was placed in the D/HH Center Site Program, she attended an out-of-

10   neighborhood school, Crossler Middle School, for sixth to eighth grade because this is where the

11   D/HH Center Site for middle school was located. If the D/HH Program had continued, A.M-G.

12   would have attended high school at Sprague High School, which is also not her neighborhood

13   school. P.G. Decl. ¶27. With the D/HH Program closed, A.M-G. would attend McKay High

14   School in her neighborhood. P.G. Decl. ¶27.

15       The Plaintiffs know of no other Deaf students that will attend McKay High School this

16   next school year and A.M-G. will likely be the only Deaf student in all her classes leaving her

17   linguistically and culturally isolated without other students or staff that she can go to for support

18   on her class work. A.M-G.'s unique communication needs have not been accounted for in this

19   unilateral placement determination. P.G. Decl. ¶23, 28, 31.

20       Plaintiff A.M-G. and the other students in her Deaf cohort who would otherwise attend

21   the D/HH Center Site program will suffer immediate and irreparable harm due to their inability

22   to access meaningful communication access and a free and appropriate public education if the

23   D/HH Center Site is shuttered. P.G. Decl. ¶16, 17, 19, 21, 23, 26, 30. The importance of

MOTION AND MEMO IN SUPPORT OF TRO
AND PRELIMINARY INJUNCTION

24

PAGE 5 OF 23

Cedar Law PLLC
113 Cherry St., PMB 96563
Seattle, WA 98104-2205
lara@cedarlawpllc.com
Ph : (206) 607-8277 | Fax 206.237.9101

1   maintaining a student's current educational placement is highlighted by the fact that the IDEA

2   provides a statutory injunction against changes in educational placement in the form of "stay

3   put" during the pendency of proceedings. Furthermore, the fact that a stay put injunction is

4   automatic and does not require any analysis of the merits of a student's due process claims is

5   evidence of the harm that can occur through an unlawful and erroneous change in placement.

6                           **III.    PROCEDURAL HISTORY**

7           Plaintiffs initiated an administrative due process hearing request regarding the provision

8   of special education and related services to A.M-G., which was assigned Oregon Department of

9   Education Case No. DP 24-014 and Office of Administrative Hearings Case No. 2024-ABC-

10  06570. The named Defendant was SKPS, and the matter was assigned to Senior Administrative

11  Law Judge ("ALJ") Allen. Plaintiffs filed a joint Motion to Consolidate this matter with a closely

12  related matter. The ALJ failed to rule on this motion.

13          Defendant SKPS filed a Motion to Dismiss the Plaintiff's due process hearing request on

14  the basis that closure of the D/HH Program had not yet caused hardship to A.M-G. because the

15  2024/25 school year had not commenced. Plaintiffs responded and sought leave to amend their

16  due process hearing request to include WESD as a defendant.

17          Plaintiffs both invoked stay-put in their due process hearing request and filed a Motion

18  for Stay Put pursuant to 20 U.S.C. § 1415(j); 34 C.F.R. § 300.518(a); Oregon Rev. Stat. §

19  343.177(1); and Oregon Admin. Rules 581-015-2360(5)(a). Under 20 U.S.C. § 1415(j), "during

20  the pendency of any proceedings conducted pursuant to this section … the child shall remain in

21  the then-current educational placement of the child." Under Oregon Rev. Stat. § 343.177(1),

22  "During the pendency of any administrative or judicial proceedings concerning the …

23  educational placement of the child or the provision of a free appropriate public education to the

24  MOTION AND MEMO IN SUPPORT OF TRO
    AND PRELIMINARY INJUNCTION

    PAGE 6 OF 23

1   child, the child shall remain in the then current educational <u>program</u> placement." (emphasis

2   added).

3       On August 9, 2024, ALJ Allen issued a Consolidated Final Order ("Final Order") on the

4   Defendant's Motion to Dismiss and Plaintiff's Motion for Stay Put that applied equally to the

5   two related matters at issue, a copy of which is appended to the Declaration of Anna Moritz as

6   Exhibit E. In the Final Order ALJ Allen erroneously denied the Plaintiffs' Motion for Stay Put

7   on the basis that the D/HH Program did not constitute a "placement" under the IDEA because it

8   was not specifically named in A.M-G.'s placement document for the most recent school year.

9   Moritz Decl., Exhibit E, pg. 9, ¶4. This determination is contrary to the law and erroneously

10  defines the D/HH Center Site Program as merely a "format" for providing services under the

11  student's IEP. Moritz Decl., Exhibit E, pg. 9, ¶3.

12      ALJ Allen further erred in dismissing the Plaintiff's due process request for lack of

13  ripeness on the basis that any harm is "speculative." Moritz Decl., Exhibit E, pg. 14, ¶3. The

14  closure of the D/HH Program is not in factual question and represents final agency action. In

15  addition, the loss of the Deaf cohort of students and centralized services through the D/HH

16  Center Site as well as a physical change of schools and represents imminent hardship to the

17  Plaintiffs. As such, this matter was ripe for adjudication.

18      Because ALJ Allen ordered the dismissal of the Plaintiffs' due process hearing request,

19  the Final Order did not address the Plaintiffs' request for leave to join the WESD as a defendant

20  in this matter.

21      The ALJ's legally flawed Final Order has denied A.M-G. and her Deaf cohort the

22  protection of the stay-put provision of the IDEA. Consequently, they will experience irreparable

23  harm if the requested relief is not granted.

MOTION AND MEMO IN SUPPORT OF TRO
AND PRELIMINARY INJUNCTION

24

Cedar Law PLLC
113 Cherry St., PMB 96563
Seattle, WA 98104-2205
lara@cedarlawpllc.com
Ph : (206) 607-8277 | Fax 206.237.9101

1

## IV.    ARGUMENT

2

### A. The ALJ Erred in Declining to Reinstate the Student's Stay Put Placement in the D/HH Center Site Program.

3

4       The ALJ erred in declining to reinstate the Student's placement in the D/HH Center Site

5   Program and finding "placement is more appropriately defined as the SDI and related services

6   identified in the operative IEP necessary to permit him/her to access the general education

7   curriculum and receive a FAPE." Moritz Decl., Exhibit E, pg. 13, ¶2.

8       The "stay put" provision pursuant to 20 U.S.C. § 1415(j); 34 C.F.R. § 300.518(a); Oregon

9   Rev. Stat. § 343.177(1); and Oregon Admin. Rules 581-015-2360(5)(a) allows a student to

10  remain in their then-current educational placement during the pendency of proceedings. *See, e.g.*,

11  *K.D. ex rel. C.L. v. Haw. Dep't of Educ.*, 665 F.3d 1110, 1120 (9th Cir. 2011).

12      The IDEA provides in relevant part:

13          [D]uring the pendency of any proceedings conducted pursuant to this
            section, unless the State or local educational agency and the parents
14          otherwise agree, the child shall remain in the then-current educational
            placement of the child, or, if applying for initial admission to a public
15          school, shall, with the consent of the parents, be placed in the public school
            program until all such proceedings have been completed.
16

17  20 U.S.C. § 1415(j). This is known as the "stay put" provision. The U.S. Supreme Court has

18  addressed the stay-put provision under IDEA, providing:

19          The language of [the "stay put" provision] is unequivocal. It states plainly
            that during the pendency of any proceedings initiated under the Act, unless
20          the state or local education agency and the parents or guardians of a disabled
            child otherwise agree, "the child *shall* remain in the then current educational
21          placement."

22

23

24

MOTION AND MEMO IN SUPPORT OF TRO
AND PRELIMINARY INJUNCTION

PAGE 8 OF 23

*Honig v. Doe*, 484 U.S. 305, 323, 108 S.Ct. 592, 98 L.Ed.2d 686 (U.S. 1988) (emphasis in original).

The purpose of the stay-put provision was to "strip schools of the *unilateral* authority they had traditionally employed to exclude disabled students ... from school' and to protect children from any retaliatory action by the agency." *Honig* 484 U.S. at 323. (emphasis original). The Supreme Court has also found that another purpose of the stay-put provision was to "prevent school officials from removing a child from the regular public-school classroom over the parents' objection" which resulted from Congress's concern "about the apparently widespread practice of relegating handicapped children to private institutions or warehousing them in special classes." *Sch. Comm. of the Town of Burlington, Mass. v. Dep't of Educ. of Mass.,* 471 U.S. 359, 373, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985).

### 1. The Stay Put Provision Acts as an Automatic Injunction.

Stay put under § 1415(j) functions as an *automatic statutory injunction* once the plaintiff has made its two-factor showing — (1) a "proceeding[ ] conducted pursuant to" 20 U.S.C. § 1415 is "pend[ing]," and (2) the agency is attempting to alter the student's then-current educational placement. *see S.C . ex rel. K.G. v. Lincoln Cnty. Sch. Dist*., 16 F.4th 587, 589 (9th Cir. 2021) ("Stay put functions as an automatic preliminary injunction, and the moving party need not show the traditionally required preliminary injunction factors to obtain relief.") (*quoting Joshua A. v. Rocklin Unified Sch. Dist*., 559 F.3d 1036, 1037 (9th Cir. 2009) (internal quotations omitted)); *Olu-Cole v. E.L. Haynes Pub. Charter Sch.*, 930 F.3d 519, 527 (D.C. Cir. 2019) ("[O]nce Olu-Cole's motion for a preliminary injunction demonstrated that the two statutorily required factors were met, there was a paradigm shift. Stay put locked in [the child's] educational

Cedar Law PLLC
113 Cherry St., PMB 96563
Seattle, WA 98104-2205
lara@cedarlawpllc.com
Ph : (206) 607-8277 | Fax 206.237.9101

1    status quo, and the party that needed injunctive relief was the School seeking to derail the

2    statute's ordinary operation.").

3    Because the IDEA deems any exclusion from appropriate public education in itself to be

4    a significant harm, once those two statutory factors are established, the student need not

5    otherwise show irreparable harm. *Olu-Cole,* 930 F.3d at 527; *see also Joshua A.,* 559 F.3d at

6    1040. Considering this risk, the stay put provision acts as a powerful protective measure to

7    prevent disruption of the child's education throughout the dispute process. *Joshua A.* 559 F.3d at

8    1040. Furthermore, "[b]ecause the injunction is automatic, a student who requests an

9    administrative due process hearing is entitled to remain in his educational placement regardless

10   of the strength of his case or the likelihood he will be harmed by a change in placement." *A.D.*

11   *ex rel. L.D. v. Hawaii Dep't of Educ.*, 727 F.3d 911, 914 (9th Cir. 2013); *see also D.G. ex rel.*

12   *P.G. v. San Diego Unified Sch. Dist.*, 132 F. Supp. 3d 1224, 1227 (S.D. Cal. 2015). In this case,

13   a change to neighborhood school delivery of services is a significant disruption such that the

14   status quo (continued placement at the D/HH Center Site Program) should be maintained

15   throughout the dispute process.

16   a. A Proceeding was Pending when the Parent Invoked Stay Put.

17   First, a proceeding conducted pursuant to 20 U.S.C. § 1415 was pending when the Parent

18   invoked stay put. A parent is entitled to file for due process after a school district proposes a

19   change to an IEP, but prior to the implementation of the revised IEP. *N.E. by & through C.E. &*

20   *P.E. v. Seattle Sch. Dist.*, 842 F.3d 1093, 1098 (9th Cir. 2016) (Parent challenging a change of

21   placement decision could not invoke stay put after new IEP had already begun implementation).

22   In this case, the WESD sent a letter to the Parent on March 21, 2024, indicating that "the Crossler

23   and Sprague Regional Deaf/Hard of Hearing Programs will be closing at the end of the 2023-

24

MOTION AND MEMO IN SUPPORT OF TRO
AND PRELIMINARY INJUNCTION

PAGE 10 OF 23

2024 school year." P.G.Moritz Decl., Ex. C; P.G. Decl. ¶13. The change of placement was memorialized in the May 2024 IEP and the team discussed the Student's transition back to her neighborhood school. P.G. Decl. ¶14. The Parent objected to the change in placement. P.G. Decl. ¶14. On May 30, 2024, the Parent filed a due process hearing request challenging the change in placement and invoked stay put. Moritz Decl., Ex. F, pg. 1. Had the Parent waited to file for due process after the new placement had been implemented, she would have lost her ability to invoke stay put. *N.E.* 842 F.3d at 1098.

Additionally, the start of the 2024-25 school year does not moot the issue of stay put. The Parent is seeking reinstatement in the D/HH Center Site program, which was the program in existence when she filed for due process and invoked stay put. Reinstatement is available relief within the scope of the request for an injunction. *N.D. v. Reykdal*, 102 F.4th 982, 995 (9th Cir. 2024). Because the Student can obtain relief through reinstatement, this appeal is not moot. *Id.* (Reinstatement in student's educational program after he had been exited from services was appropriate although the Superintendent argued that it would be considerable time and expense to reinstate the student.) Therefore, the Plaintiffs can satisfy the first factor of the automatic statutory injunction that a proceeding was pending at the time they invoked stay put.

b. The Defendants are Attempting to Alter the Student's Then-Current Placement.

The inquiry in a stay-put case is limited to identifying the "then-current educational placement." 20 U.S.C. § 1415(j). IDEA's stay-put clause confers upon special needs students the "right to remain at the last agreed-upon placement." *Joshua A.,* 559 F.3d at 1037-40.[2]

---

[2] While *Joshua A.* only refers to the "current educational placement" for stay put, the subsequent *Marcus I.* decision refers specifically to the "last agreed upon placement or last implemented

MOTION AND MEMO IN SUPPORT OF TRO
AND PRELIMINARY INJUNCTION

PAGE 11 OF 23

Cedar Law PLLC
113 Cherry St., PMB 96563
Seattle, WA 98104-2205
lara@cedarlawpllc.com
Ph : (206) 607-8277 | Fax 206.237.9101

"Educational placement," in the context of IDEA in general, and in the context of the stay-put clause, is a term of art. A change of placement occurs "when there is a significant change in the student's program even if the student remains in the same setting." *N.D. ex rel. parents acting as guardians ad litem v. Hawaii Dep't of Educ.*, 600 F.3d 1104, 1116 (9th Cir. 2010).

In *Letter to Fisher*, 21 IDELR 992 (OSEP 1994), the Department of Education's Office of Special Education Programs explained that there are three components to an educational placement:

> It is these three components-the education program set out in the student's IEP, the option on the continuum [of alternative placements] in which the student's IEP is to be implemented, and the school or facility selected to implement the student's IEP-that comprise a placement decision under Part B [of the IDEA] ....

All three components of the Student's placement are significantly altered by placing her in the neighborhood school instead of the D/HH Center Site program. First, the last agreed to and implemented IEP was the May 2023 IEP, which was in place when the Parent received the closure letter from the Defendants. *See N.E.,* 842 F.3d 1093 ("Educational placement" should be interpreted as the placement set forth in the child's last implemented IEP.) There are a number of changes to components of the Student's educational program between the May 2023 IEP and the May 2024 IEP (the IEP developed in anticipation of closure of the D/HH Center Site Program). Compare Moritz Decl., Ex. G and H. For example, the student will no longer have access to a TOD daily and will only see a TOD one day per week. P.G. Decl. ¶16. Some of the Student's specially designed instruction ("SDI") will be delivered by a special education teacher

---

IEP placement" and expressly cites to *Joshua A. Marcus I. ex. Rel. Karen I. v. Department of Educ.*, 506 Fed. Appx. 613, 615 (9th Cir. 2013) (Citing 20 U.S.C. §1415(j)).

MOTION AND MEMO IN SUPPORT OF TRO
AND PRELIMINARY INJUNCTION

Cedar Law PLLC
113 Cherry St., PMB 96563
Seattle, WA 98104-2205
lara@cedarlawpllc.com
Ph : (206) 607-8277 | Fax 206.237.9101

PAGE 12 OF 23

(with no background in deaf education) instead of a "D/HH specialist" or TOD. Moritz Decl., Ex. H, pg. 10. The Student will no longer receive her SDI in the "D/HH [Learning Resource Center]" classroom with deaf peers and instead will receive SDI in a "Foundations class" with hearing peers. Moritz Decl., Ex. H, pg. 12. The Student's SDI in the area of self-advocacy delivered by a D/HH specialist will be reduced from 10 minutes per week to only 30 minutes once per <u>month</u>. Moritz Decl., Ex. H, pg. 10. And the Student will no longer have a D/HH teacher on site to help with her homework and classroom assignments. Moritz Decl., Ex. G, pg. 3. Practically, the Student will not have Deaf peers that she currently utilizes for support with academics and are critical for social/emotional development. P.G. Decl. ¶18, 20, 22, 25, 26.

Second, the Student's placement on the continuum of services will also change when placement changes to her neighborhood school — a fundamentally more restrictive setting on the continuum of available placements for this Student because it will limit her opportunities for direct communication. The IEP team for a child who is deaf or has a hearing impairment must "consider the *child's language and communication needs, opportunities for direct communications with peers and professional personnel in the child's language and communication mode*, academic level, and full range of needs, including opportunities for *direct instruction in the child's language and communication mode*." 34 CFR 300.324 (a)(2)(iv) (emphasis added). In some instances — like the situation presented in this case — education with other students who are deaf may be the least restrictive environment ("LRE") in which a child who is deaf can receive meaningful educational benefit. *See, e.g., Flour Bluff Indep. Sch. Dist. v. Katherine M. by Lesa T.,* 91 F.3d 689 (5th Cir. 1996) (Placement at a regional day school for deaf students was a less restrictive placement than the Student's neighborhood school closer to her home because of her access to deaf peers and centralized services); *Poolaw v. Bishop,* 67

MOTION AND MEMO IN SUPPORT OF TRO
AND PRELIMINARY INJUNCTION

PAGE 13 OF 23

F.3d 830 (9th Cir. 1995) (Placement in a residential school for the deaf 280 miles from the student's home was a less restrictive placement than the student's neighborhood school because of the child's need for total immersion in ASL). In this case, the Student's IEP team chose to place the Student in the Center Site D/HH Program *as opposed to* her neighborhood school specifically because the Student's unique communication needs could not be met at her neighborhood school. P.G. Decl. ¶6. The D/HH Center Site Program was the *operative placement* actually functioning at the time the Parent invoked stay put, and thus it is irrelevant that the District changed the language describing the D/HH Center Site Program beginning in the Student's IEPs from 2023 onward. *See e.g. Drinker by Drinker v. Colonial Sch. Dist.*, 78 F.3d 859, 867 (3d Cir. 1996) ("Because the term [stay put] connotes preservation of the status quo, it refers to the operative placement actually functioning at the time the dispute first arises.") (*Quoting Thomas v. Cincinnati Bd. of Educ.,* 918 F.2d 618, 625–26 (6th Cir.1990)).

Third, the school or facility selected to implement the Student's IEP will change. The Student's physical location will change from Sprague High School, the school she would have attended if the D/HH Center Site Program remained intact, to McKay High School, her neighborhood school. P.G. Decl. ¶27. It is also notable that the type of classroom designated for instruction will change from the D/HH LRC, a classroom specific to the education of Deaf students, to a "Foundations" classroom. Compare Moritz Decl., Ex. G and Ex. H.

Because all three components of the Student's education program will change, the change to the Student's neighborhood school represents a "substantial and material" alteration to her educational program. *See, e.g., Hale ex rel. Hale v. Poplar Bluffs R-I Sch. Dist.*, 280 F.3d 831, 833–34 (8th Cir. 2002) (Changing a student's location from home to school but maintaining the same services constituted a change of placement); *E. E. by & through Hutchison-Escobedo v.*

MOTION AND MEMO IN SUPPORT OF TRO AND PRELIMINARY INJUNCTION

PAGE 14 OF 23

Cedar Law PLLC
113 Cherry St., PMB 96563
Seattle, WA 98104-2205
lara@cedarlawpllc.com
Ph : (206) 607-8277 | Fax 206.237.9101

1    *Norris Sch. Dist*., 4 F.4th 866, 873 (9th Cir. 2021) (Stay put required the student be returned to

2    the elementary school he was at when the parents filed a due process hearing request although

3    services remained the same). Thus, the Defendants are attempting to change the Student's

4    educational placement and the second factor has also been met.

5                    **B.  The ALJ Erred in Granting the Defendant's Motion to Dismiss**.

6          Additionally, the ALJ erred in dismissing the Parent's claims finding, "As plead, the

7    Parent's claims in the Due Process Complaint are merely conjecture and fail to assert present

8    facts demonstrating or claiming current harm ripe for adjudication." Moritz Decl., Exhibit E, pg.

9    15. As stated above, the Parent is challenging a proposed change of placement and invoking stay

10   put. *Supra* Sec. IV.A. Thus, filing before the new IEP could be implemented was proper and

11   necessary to preserve the Parent's right to invoke stay put. The ALJ's ruling essentially renders

12   the stay put provision meaningless under § 1415(j) as no parent could file for due process and

13   invoke stay put until the change in placement has already been implemented.

14         It is well established that "whether administrative action is ripe requires the court to

15   evaluate (1) the fitness of the issues for judicial decision; and (2) the hardship to the parties of

16   withholding court consideration. *Principal Life Ins. Co. v. Robinson*, 394 F.3d 665, 670 (9th Cir.

17   2005) (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681

18   (1967), overruled on other grounds by *Califano v. Sanders*, 430 U.S. 99, 105, 97 S.Ct. 980, 51

19   L.Ed.2d 192 (1977). The first prong, fitness for judicial decision, has been characterized as "the

20   issues raised are primarily legal, do not require further factual development, and the challenged

21   action is final." *U.S. West Commc'n v. MFS Intelenet, Inc.*, 193 F.3d 1112, 1118 (9th Cir. 1999).

22   Another framing of this prong is that "the controversy must involve present facts as opposed to

23   a dispute which is based on future events of a hypothetical issue." *McIntire v. Forbes*, 322 Ore.

24   MOTION AND MEMO IN SUPPORT OF TRO
     AND PRELIMINARY INJUNCTION

     PAGE 15 OF 23

426, 434 (1996) (quoting *Brown v. Oregon State Bar*, 293 Ore. 446, 449 (1982). The Parent's claims are ripe when "[w]ithholding judicial review would deprive the parents of a potentially available remedy." *Chavez v. New Mexico Pub. Educ. Dep't*, 621F.3d 1275 (10th Cir. 2010).

First, the issues for judicial review are ripe because the District has unilaterally changed the Student's placement to her neighborhood school. This change will go into effect at the beginning of the 2024-25 school year. P.G. Decl. ¶15. These are not uncertain or contingent events that may not occur at all — the Student's change in placement is certain. *See Chavez* 621 F.3d at 1281. The Parent properly filed for due process and invoked stay put after the change in placement was decided yet before the new IEP could be implemented. *See supra* Sec. IV.A.

Second, withholding judicial review will cause considerable hardship. The Student will be irrevocably harmed by placement in a school where she cannot communicate directly with anyone except for an interpreter. P.G. Decl. ¶19, 23. The Parent is rightfully concerned that going from a language-rich environment to a limited language environment will impact her language development, self-confidence, and ability to access academics. P.G. Decl. ¶23, 31. Although it is clear the Student will be irrevocably harmed, the Parent need not prove that harm at this juncture: the fact that the Student will be removed from her educational placement is sufficient to show irreparable harm. *N. D. v. Reykdal*, 102 F.4th 982, 995 (9th Cir. 2024).

Similar disruptions of special education programing have been found to cause irreparable harm. *See N.D. ex rel. Parents Acting As Guardians Ad Litem v. Hawaii Dep't of Educ.*, 600 F.3d 1104, 1112–13 (9th Cir. 2010) (affirming a finding of irreparable harm where plaintiff had been deprived of special education and consequently "demonstrated regression in his behavior, increased difficulty with activities, and outbursts of frustration and violence"). As one court has observed, "[i]t is almost beyond dispute that wrongful discontinuation of a special education

Cedar Law PLLC
113 Cherry St., PMB 96563
Seattle, WA 98104-2205
lara@cedarlawpllc.com
Ph : (206) 607-8277 | Fax 206.237.9101

program to which a student is entitled subjects that student to actual irreparable harm." *Cosgrove v. Board of Educ. of Niskayuna Cent. Sch. Dist.*, 175 F. Supp. 2d 375, 392 (N.D.N.Y. 2001); *see id.* at 392–93 (collecting cases). Notably, failing to provide a full-time TOD to a deaf student can cause irreparable harm if that service is necessary. *See Kantak v. Bd. of Educ., Liverpool Cent. Sch. Dist.*, No. 90-CV-4, 1990 WL 36803, at *2 (N.D.N.Y. Mar. 30, 1990).

The ALJ relied on *Bookout v. Bellflower Unified School District*, 2014 WL 1152948 (C.D. Cal. 2014), which is inapposite from this matter. In *Bookout,* the district sought a declaratory judgment from the ALJ whether it was "required" to contract with the school currently serving the student, despite the fact there had been <u>no evidence</u> that a change in in the student's placement had been discussed or contemplated. 2014 WL 1152948. Those facts are easily distinguished from this matter. The WESD and SKPS have made it abundantly clear that the D/HH Center Site Program will no longer be in existence at the middle school and high school levels beginning in the 2024/25 school year – a clear change in placement – entirely unlike the hypothetical question in *Bookout* as to whether a current, unchallenged placement must continue.

In conclusion, the Parent's claims were ripe for adjudication and the ALJ erred in granting the District's motion to dismiss when the Parent timely filed for due process and invoked stay put.

### C. Injunctive Relief Under Title II of the ADA and Section 504 of the Rehabilitation Act.

Even in the absence of the automatic statutory injunction standard, the Plaintiff can still meet the established criteria for a preliminary injunction under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12132, 12134, and Section 504 of the Rehabilitation

MOTION AND MEMO IN SUPPORT OF TRO AND PRELIMINARY INJUNCTION

PAGE 17 OF 23

Cedar Law PLLC
113 Cherry St., PMB 96563
Seattle, WA 98104-2205
lara@cedarlawpllc.com
Ph : (206) 607-8277 | Fax 206.237.9101

Act, 29 U.S.C. §794. The two federal statutes are generally analogous, and therefore the remainder of this discussion will focus on the ADA.

### 1. The Student Will Be Denied Meaningful Communication Access Through Removal from the D/HH Center Site Program.

Title II of the ADA, the title applicable to public services, provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be *subjected to discrimination by any such entity*," and requires that the DOJ promulgate regulations to implement this provision. 42 U.S.C. §§ 12132, 12134 (emphasis added). Among the DOJ's Title II-implementing regulations, and at the core of these appeals, is the so-called "effective communications regulation," which spells out public entities' communications-related duties towards those with disabilities. *See* 28 C.F.R. § 35.160 (2010). Public entities must "take appropriate steps to ensure that communications with applicants, participants, and members of the public with disabilities are as effective as communications with others." *Id.* § 35.160(a).

Substantively, the IDEA sets only a floor of access to education for children with communications disabilities but requires school districts to provide the individualized services necessary to get a child to that floor, regardless of the costs, administrative burdens, or program alterations required. *K.M. ex rel. Bright v. Tustin Unified Sch. Dist.*, 725 F.3d 1088 (9th Cir. 2013). Title II and its implementing regulations, taken together, require public entities to take steps towards making existing services not just accessible, but *equally accessible* to people with communication disabilities, but only insofar as doing so does not pose an undue burden or require a fundamental alteration of their programs. *Id.* at 1101.

Cedar Law PLLC
113 Cherry St., PMB 96563
Seattle, WA 98104-2205
lara@cedarlawpllc.com
Ph : (206) 607-8277 | Fax 206.237.9101

Comparing the relevant statutory and regulatory texts, it is clear that the IDEA's FAPE requirement and the Title II communication requirements are significantly different. The result is that "in some situations, but not others, schools may be required under the ADA to provide services to deaf or hard-of-hearing students that are different than the services required by the IDEA." *Id.* at 1100. Here, the Student will be denied effective communication access when the D/HH Center Site Program closes and she is returned to her neighborhood school. She will not have equally accessible communication at school because all communication will be filtered through a fallible interpreter. P.G. Decl. ¶20. She will also be denied the usual accommodations she previously had and utilized to make up for communication deficiencies such as deaf peers and daily access to her TOD. P.G. Decl. ¶4, 5, 7, 9, 16, 17, 19, 22, 26. Interpreters are no substitute for having direct communication access. For example, in Oregon an ASL interpreter is only required to demonstrate 60 percent accuracy to work in public schools. P.G. Decl. ¶20. *See also* Or. Admin. Rules 581-015-2035 (2)(b) (Sign language interpreters must achieve a pass score of 3.5 on the EIPA Performance Test). Utilizing a sign language interpreter is a skill that the Student is working on but has not perfected. P.G. Decl. ¶20. Taking into account the inevitable deficiencies in communication that come from not having access to deaf peers or a TOD, the Student will not have meaningful and effective communication access as her peers with typical hearing do.

### 2. Plaintiff Meets the Traditional Standard for a Preliminary Injunction Under Title II of the ADA and Section 504 of the Rehabilitation Act.

The proper legal standard for preliminary injunctive relief requires a party to demonstrate "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an

MOTION AND MEMO IN SUPPORT OF TRO
AND PRELIMINARY INJUNCTION

PAGE 19 OF 23

1    injunction is in the public interest." *Stormans, Inc. v. Selecky*, 586 F.3d 1109 (9th Cir. 2009)

2    (*Citing Winter v. Natural Resources Defense Council, Inc.* 555 U.S. 7129 S.Ct. 365 (U.S. 2008)).

3        The Plaintiffs can satisfy the *Winter* test for a TRO and preliminary injunctive relief.

4    First, the Student is likely to succeed on the merits. A plaintiff bringing suit under Title II of the

5    ADA must show: (1) she is a qualified individual with a disability; (2) she was denied "a

6    reasonable accommodation that [she] needs in order to enjoy meaningful access to the benefits

7    of public services;" and (3) the program providing the benefit receives federal financial

8    assistance*. Mark H. v. Hamamoto*, 620 F.3d 1090, 1097 (9th Cir.2010).

9        In this case, there is no argument that the Student is a qualified individual with a disability

10    due to her hearing loss and public schools must comply with the ADA. *See* 42 U.S.C. §

11    12101(a)(3) (listing "education" in the ADA congressional findings section as one of "critical

12    areas" in which disability discrimination exists).

13        The question of whether the Student was deprived of a reasonable accommodation

14    necessary for meaningful access is also evident. The phrase "meaningful access" derives not

15    from the text of the ADA or its implementing regulations, but from the Supreme Court's opinion

16    in *Alexander v. Choate*, 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985). In determining

17    whether deaf students were denied meaningful access to the school's benefits and services, the

18    Ninth Circuit found that the Title II effective communications regulation guides the analysis. *See*

19    *K.M.,* 725 F.3d at 1102.

20        Reasonable accommodation does not require an organization to make fundamental or

21    substantial alterations to its programs. *See Choate,* 469 U.S. at 300–01, 105 S.Ct. 712.

22    Reasonableness "depends on the individual circumstances of each case, and requires a fact-

23    specific, individualized analysis of the disabled individual's circumstances and the

24    MOTION AND MEMO IN SUPPORT OF TRO
AND PRELIMINARY INJUNCTION

Cedar Law PLLC
113 Cherry St., PMB 96563
Seattle, WA 98104-2205
lara@cedarlawpllc.com
Ph : (206) 607-8277 | Fax 206.237.9101

accommodations that might allow him to [enjoy meaningful access to the program.]" *Vinson v. Thomas,* 288 F.3d 1145, 1154 (9th Cir.2002) (internal citation and quotation marks omitted). An accommodation is reasonable if it is "reasonable on its face, *i.e.,* ordinarily or in the run of cases." *U.S. Airways, Inc. v. Barnett,* 535 U.S. 391, 402, 122 S.Ct. 1516, 152 L.Ed.2d 589 (2002).

In this case, the Student is being denied reasonable accommodations and services through closure of the D/HH program because she will no longer have access to direct communication opportunities with peers that use ASL, she will no longer have access to direct communication opportunities with staff throughout her day, she will not have on site technology support for her cochlear implants when issues arise, and essentially she will be extremely limited in her communication opportunities. P.G. Decl. ¶16, 19, 28, 30. The Plaintiffs are not requesting a fundamental alteration to the school program, they are simply asking to maintain the program already in existence.

Failure to provide disability specific services to students can amount to a denial of reasonable accommodations. *Mark H.*, 620 F.3d at 1098. In *Mark H.* two students with autism did not have meaningful access to their program because the district failed to provide autism-specific services such as Discrete Trial Training and the full-time assistance of a specially trained therapeutic aide when the district was on notice that those services were needed. *Id.* Here, the Student is facing a similar denial of reasonable accommodation as she is not being provided the deaf-specific services she requires such as access to deaf peers and access to a full-time TOD.

Moreover, in *Duvall v. County of Kitsap*, the Court held that there were genuine issues of fact regarding reasonable accommodation where there was some evidence that a deaf plaintiff needed videotext display to follow court proceedings and that defendants denied plaintiff's request for videotext display without adequately investigating whether videotext display was

MOTION AND MEMO IN SUPPORT OF TRO
AND PRELIMINARY INJUNCTION

PAGE 21 OF 23

available as a reasonable accommodation. 260 F.3d 1124, 1136–38 (9th Cir. 2001). The Court also considered factors in determining lack of meaningful communication access such as limited movement without the accommodation, the necessity to overly concentrate, and headaches due to prolonged concentration and focus. *Id*.

Finally, in *K.M. ex rel. Bright v. Tustin Unified Sch. Dist*., there were genuine issues of material fact as to whether two students who were deaf or hard-of-hearing had meaningful communication access when their request for word-for-word transcription services were denied by the district. 725 F.3d 1088 (9th Cir. 2013). The students also alleged that without reasonable accommodations they could not fully understand teacher and fellow students without undue strain and consequent stress. *Id*. Similarly to all three of the above cases, the Student will be denied meaningful communication access if the deaf-specific services she requires are no longer available or only available to her in limited ways.

The second and third prongs of the *Winter* test are also satisfied in this case. The Student is suffering and will continue to suffer irreparable harm each day she is kept out of her rightful educational placement in the absence of preliminary relief. *Supra* Sec. IV.B. Finally, appropriate enforcement of federal special education law by way of an injunction is in the public interest as it promotes the purpose of the ADA and prevents unilateral action by districts to deny meaningful communication access to deaf students.

**D. The Plaintiffs Have Satisfied Federal Rule 65.**

Lastly, pursuant to Fed. Rule. Civ. Proc. 65(a) Plaintiffs' counsel informed the Defendants' attorneys of their intent to seek a TRO and preliminary injunctive relief prior to filing this motion and memo, and copies of all documents submitted to this court have been provided to the SKSP and WESD counsel. The Plaintiffs request that no security be required

MOTION AND MEMO IN SUPPORT OF TRO
AND PRELIMINARY INJUNCTION

Cedar Law PLLC
113 Cherry St., PMB 96563
Seattle, WA 98104-2205
lara@cedarlawpllc.com
Ph : (206) 607-8277 | Fax 206.237.9101

pursuant to Fed. Rule. Civ. Proc. 65(c) as the entry of a permanent injunction will not result in any cost of damages that the District would not otherwise incur providing the Student with her free and appropriate public education pursuant to the IDEA, 20 U.S.C. §1400 *et seq*. Moreover, Defendants have no monetary stake in the outcome of this litigation.

## V.    CONCLUSION

For the foregoing reasons, the Plaintiffs request that the Court immediately issue a temporary restraining order with a preliminary injunction issued subsequently. The Plaintiffs request the Court to grant this motion and issue a temporary restraining order requiring SKPS/WESD to reinstate A.M-G. in the D/HH Center Site Program and maintain that program during the pendency of litigation.

Dated: September 9, 2024.

CEDAR LAW PLLC

Lara Hruska, OSB No. 230637

Anna Moritz, OSB No. 225306

113 Cherry St., PMB 96563,
Seattle, WA 98104-2205
(206) 607-8277 [tel]
(206) 237-9101[fax]
lara@cedarlawpllc.com
anna@cedarlawpllc.com
Attorneys for Plaintiffs

MOTION AND MEMO IN SUPPORT OF TRO
AND PRELIMINARY INJUNCTION

PAGE 23 OF 23

Cedar Law PLLC
113 Cherry St., PMB 96563
Seattle, WA 98104-2205
lara@cedarlawpllc.com
Ph : (206) 607-8277 | Fax 206.237.9101